WO                                                                      JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Samuel Rudolph Rotondo,                 )     No. CV 10-0957-PHX-SMM (SPL)
                                        )
              Plaintiff,                )
                                        )
vs.                                     )     **MEMORANDUM OF DECISION**
                                        )     **AND ORDER**
Charles Ryan, et al.,                   )
                                        )
              Defendants                )
                                        )
_____)

        Plaintiff Samuel Rudolph Rotondo filed a civil rights action under 42 U.S.C.

§ 1983 against multiple Arizona Department of Corrections (ADC) officials (Doc. 1).

Before the Court is Defendants' Motion for Summary Judgment (Doc. 58), to which

Plaintiff did not respond.

        The Court will grant Defendants' motion and terminate the action.

**I.    Background**

        Plaintiff's claims concern his transfer to and confinement at the ADC Eyman

Complex-Browning Unit, a supermax prison facility in Florence, Arizona (Doc. 1 at 1).

He named the following Defendants: (1) Director Charles Ryan; (2) Deputy Warden A.

Ramos; (3) Security Threat Group (STG) Coordinator George Smith; (4) STG

Investigator Lisa Celaya; and STG Committee Members (5) J. Kimble, (6) J. Freeland,

1   and (7) R. Bock (id.).[1]

2   In Count I of his Complaint, Plaintiff alleged that all Defendants violated his due

3   process rights during the STG validation process when they failed to provide him with

4   notice of the charges against him and prevented him from using witness statements at his

5   hearing (id. at 3-3G).  Plaintiff further alleged that he is subject to indefinite confinement

6   under conditions that constitute an atypical and significant hardship and he is denied any

7   meaningful review of his classification status (id.).

8   In Count II, Plaintiff alleged that Ryan and Ramos violated his Eighth Amendment

9   rights when they subjected him to conditions of confinement that constituted cruel and

10   unusual punishment, including the denial of outdoor recreation, constant illumination in

11   his cell, complete isolation, and limited food (id. at 4-4B).[2]

12   Defendants now move for summary judgment on the grounds that (1) Plaintiff

13   failed to exhaust administrative remedies for Count I as required under the Prison

14   Litigation Reform Act (PLRA), 42 U.S.C. § 1997a(a); (2) Plaintiff's STG validation

15   hearing comported with due process; (3) annual reviews of Plaintiff's status comport with

16   due process; (4) debriefing does not violate the Eighth Amendment; (5) the conditions of

17   confinement at the Browning Unit are constitutional; and (6) Defendants are entitled to

18   qualified immunity (Doc. 58).

19   The Court issued the Notice required under Rand v. Rowland, 154 F.3d 952, 962

20   (9th Cir. 1998), which informed Plaintiff of his obligation to respond and the

21   requirements of Federal Rule of Civil Procedure 56 (Doc. 60).  Plaintiff did not file a

22   response, and the time for doing so has expired.  Therefore, in its summary judgment

23   analysis, the Court will construe Plaintiff's verified Complaint as an affidavit in

24

25   [1]Upon screening, the Court dismissed Dennis Kendall, Ron Carlson, and George

26   Herman as Defendants (Doc. 5).

27   [2]The Court dismissed those allegations in Count II concerning medical care, and it

28   dismissed Counts III (alleged equal protection violation) and IV (alleged mail censorship) (Doc. 5).

1   opposition to the summary judgment motion.  See Jones v. Blanas, 393 F.3d 918, 923 (9th

2   Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as

3   evidence in opposition to summary judgment); Schroeder v. McDonald, 55 F.3d 454, 460

4   (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary

5   judgment if it is based on personal knowledge and sets forth specific facts admissible in

6   evidence).

7   **II.      Exhaustion**

8         Defendants' first argument for summary judgment is that Plaintiff did not properly

9   exhaust remedies for his claim in Count I (Doc. 58 at 7-10).  Exhaustion is a matter in

10  abatement, which is properly raised in an unenumerated Rule 12(b) motion to dismiss

11  rather than a motion for summary judgment.  Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th

12  Cir. 2003).  This is because summary judgment is on the merits, whereas dismissal for

13  nonexhaustion is not.  Id.  Thus, to the extent that Defendants argue nonexhaustion, the

14  motion will be construed as an unenumerated Rule 12(b) motion to dismiss.

15        **A.      Legal Standard**

16        Under the PLRA, an inmate must exhaust available administrative remedies before

17  bringing a federal action.  See 42 U.S.C. § 1997e(a); Griffin v. Arpaio, 557 F.3d 1117,

18  1119 (9th Cir. 2009).  Exhaustion is required for all suits about prison or jail life, Porter v.

19  Nussle, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the

20  administrative process, Booth v. Churner, 532 U.S. 731, 741 (2001).  An inmate must

21  complete the administrative review process in accordance with the applicable rules.  See

22  Woodford v. Ngo, 548 U.S. 81, 92 (2006).

23        Exhaustion is an affirmative defense.  Jones v. Bock, 549 U.S. 199, 212 (2007).

24  Therefore, the defendant bears the burden of raising and proving the absence of

25  exhaustion.  Wyatt, 315 F.3d at 1119.  Because exhaustion is a matter in abatement in an

26  unenumerated Rule 12(b) motion, a court may look beyond the pleadings to decide

27  disputed issues of fact.  Id. at 1119-20.  When doing so, a court has broad discretion as to

28  the method to be used in resolving the factual dispute.  Ritza v. Int'l Longshoremen's &

1   Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988) (quotation omitted).

2       **B.   Arguments**

3       Defendants explain that Plaintiff appealed his initial STG validation and he

4   exhausted administrative remedies as to the claims contained in his validation appeal;

5   however, Defendants assert that the claims raised in Plaintiff's Complaint are different

6   from those raised in his validation appeal (Doc. 58 at 9).  Defendants note that the claims

7   raised in Count I are that Plaintiff was unable to question witnesses at his hearing and that

8   he was not provided with proper notice before the hearing (id. at 9-10, citing Doc.1).

9   They assert that these claims are entirely different than those raised in Plaintiff's

10  validation appeal, in which he challenged the evidence used in the hearing, the Validation

11  Committee's failure to specify the evidence relied upon for its decision, and the "some

12  evidence" standard used by the Committee (id. at 10; Doc. 59, Defs.' Statement of Facts

13  (DSOF) ¶ 153).  Defendants maintain that because Plaintiff failed to raise his pending

14  claims in his Validation Appeal, he did not put Defendants on notice of those claims and

15  did not properly exhaust remedies (Doc. 58 at 10).

16      In his Complaint, Plaintiff indicates that he submitted a request for administrative

17  relief for his claims in Count I and appealed to the highest level (Doc. 1 at 3).  He

18  specifically alleges that he exhausted remedies pursuant to ADC Department Order (DO)

19  806 and the ADC internal grievance system (id. at 3(G) ¶ 27).

20      **C.   Analysis**

21      As stated, Defendants must demonstrate that there were remedies available to

22  Plaintiff.  See Wyatt, 315 F.3d at 1119; see also Brown v. Valoff, 422 F.3d 926, 936-37

23  (9th Cir. 2005).  Defendants argue that Plaintiff did not exhaust remedies as to the claims

24  raised in this lawsuit; however, they fail to describe the review process that was available

25  to Plaintiff.  See Jones, 549 U.S. at 200 (the procedural rules are defined by the prison

26  grievance process, not by the PLRA); Brown, 422 F.3d at 937.

27      In their motion, Defendants refer to the Validation Appeal filed by Plaintiff; yet,

28  they provide no explanation of the Validation Appeal process.  When reviewing

1   Defendants' documents, the Court finds a copy of DO 806, which governs STGs and

2   which contains a section on appeals of the validation decision (Doc. 59, Ex. B, Attach. 1).

3   The relevant portion states that to appeal an STG validation, an inmate must prepare an

4   appeal on an Inmate Letter form but "[i]nmates may appeal only those specific reasons

5   why they were validated" (id., DO 806.05 §§ 1.1.1, 1.1.1.1).  Defendants also submit a

6   copy of Plaintiff's Validation Appeal, which is set forth in an Inmate Letter and which

7   responds directly to each of the specific findings listed on the "Result of STG Validation

8   Hearing" form (Doc. 59, Ex. D, Attachs. 5, 7).  This evidence shows that Plaintiff strictly

9   complied with the policy governing appeals and appealed the specific reasons and

10  evidence cited in support of his validation.  Defendants fail to establish whether Plaintiff

11  could have included his pending due process claims in his Validation Appeal even if

12  those claims were not directly related to the specific reasons why he was validated.  Nor

13  do they indicate whether Plaintiff could have raised his due process claims in the standard

14  grievance process apart from the Validation Appeal.  Notably, Defendants do not respond

15  to Plaintiff's assertion that he exhausted remedies pursuant to the ADC internal grievance

16  system (Doc. 1 at 3(G) ¶ 27).

17          In short, Defendants fail to establish that there was an administrative review

18  process available to Plaintiff for the specific due process claims raised in this action and

19  that he failed to use that process.  See Wyatt, 315 F.3d at 1120 (finding the defendants'

20  documents inadequate to show exhaustion because it was unclear whether the they

21  constituted a complete record of the plaintiff's appeals or whether the plaintiff exhausted

22  his appeals).  Defendants' request to dismiss the claims in Count I for nonexhaustion will

23  therefore be denied.

24  **III.    Summary Judgment Legal Standard**

25          A court must grant summary judgment "if the movant shows that there is no

26  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

27  of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

28  (1986).  Under summary judgment practice, the movant bears the initial responsibility of

1   presenting the basis for its motion and identifying those portions of the record, together

2   with affidavits, that it believes demonstrate the absence of a genuine issue of material

3   fact.  Celotex, 477 U.S. at 323.

4        If the movant meets its initial responsibility, the burden then shifts to the

5   nonmovant to demonstrate the existence of a factual dispute and that the fact in

6   contention is material, i.e., a fact that might affect the outcome of the suit under the

7   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

8   jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S.

9   242, 248, 250 (1986) ; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th

10  Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

11  favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968);

12  however, it must "come forward with specific facts showing that there is a genuine issue

13  for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

14  (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

15       At summary judgment, the judge's function is not to weigh the evidence and

16  determine the truth but to determine whether there is a genuine issue for trial.  Anderson,

17  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and

18  draw all inferences in the nonmovant's favor.  Id. at 255.

19  **IV.    Count I-Due Process**

20       **A.    Legal Standard**

21       The Due Process Clause of the Fourteenth Amendment prohibits the states from

22  "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S.

23  Const. amend. XIV, § 1.  To determine whether a procedural due process violation has

24  occurred, a court engages in a two-step analysis.  First, a court looks to whether the

25  person possesses a constitutionally-cognizable liberty interest with which the state has

26  interfered.  Sandin v. Conner, 515 U.S. 472, 485-87 (1995).  Second, if the state has

27  interfered with a liberty interest, a court looks to whether this interference was

28  accompanied by sufficient procedural and evidentiary safeguards.  Ky. Dep't of Corr. v.

1    Thompson, 490 U.S. 454, 460 (1989).

2           It is well-settled that placement in maximum security segregation units implicates

3    a liberty interest requiring due process protections.  Wilkinson v. Austin, 545 U.S. 209,

4    224 (2005).  An inmate may be deprived of his liberty interest as long as he is accorded

5    the proper procedural protections.  For the initial decision to place an inmate in maximum

6    custody, due process is generally satisfied by notice of the factual basis for the placement

7    and an opportunity to be heard.  Id. at 224-226; Hewitt v. Helms, 459 U.S. 460, 476

8    (1983), overruled in part on other grounds by Sandin, 515 U.S. 472.  These procedural

9    mechanisms serve to avoid the risk of an erroneous deprivation; "[r]equiring officials to

10   provide a brief summary of the factual basis for the classification review and allowing the

11   inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another

12   or singled out for insufficient reason."  Wilkinson, 545 U.S. at 226.

13          After an inmate is placed in maximum security segregation, he is entitled to "some

14   sort" of periodic review of his status.  See Hewitt, 459 U.S. at 477 n. 9 ("administrative

15   segregation may not be used as a pretext for indefinite confinement of an inmate.  Prison

16   officials must engage in some sort of periodic review of the confinement of such

17   inmates").  To determine whether the periodic review afforded Plaintiff conforms to due

18   process requirements, the Court must consider "[1] the private interest that will be

19   affected by the official action; [2] the risk of an erroneous deprivation of such interest

20   through the procedures used, and the probable value, if any, of additional or substitute

21   procedural safeguards; and [3] the Government's interest, including the function involved

22   and the fiscal and administrative burdens that the additional or substitute procedural

23   requirement would entail."  Wilkinson, 545 U.S. at 224-25 (citing Matthews v. Eldridge,

24   424 U.S. 319, 335 (1976)).

25          **B.**     **Facts/Arguments**

26                  **1. Defendants' Factual Assertions**

27                          **a. STG Validation, Renunciation/Debriefing, and Step-Down Program**

28   In support of their summary judgment motion, Defendants submit a separate

1   Statement of Facts (DSOF), which is supported by the declarations of STG Supervisor

2   Jerry Dunn and Special Security Unit (SSU) Coordinators Carlos Reyna and George

3   Smith, with various attachments (Doc. 59, Exs. B-D).

4       Defendants' factual assertions relevant to Count I are summarized as follows:

5       In 1991, the ADC established an STG policy in an effort to control prison gang

6   activity in Arizona's prisons and minimize the threat posed by gangs (DSOF ¶¶ 4-5).  The

7   STG policy provides for the identification and certification of prison gangs inmate STG

8   members (id. ¶ 7).

9       Under this policy, an STG "Suspect" is an inmate believed to be involved in an

10  STG (id. ¶ 28).  To be identified as an STG Suspect, there must be documentation of

11  certain specific criteria, such as self-proclamation, tattoos, photographs, association and

12  contacts (id. ¶ 29; Doc. 59, Ex. B, Attach. 1 (DO 806, Definitions)).

13      Once an inmate is identified as a Suspect, the SSU staff initiates a "Suspect File,"

14  which contains confidential information on the Suspect including an STG Identifying

15  Questionnaire (DSOF ¶ 31).  If there is sufficient evidence in an inmate's Suspect File to

16  meet the validation criteria, the SSU staff prepares an STG Member Validation Packet

17  (id. ¶ 34).

18      An STG Validation Committee, which is made up of three deputy wardens or

19  associate deputy wardens, then conducts an STG Validation Hearing (id. ¶ 39).  The

20  Complex SSU Coordinator notifies the inmate of his Validation Hearing with the Hearing

21  Notification form—Hearing Notice—at least 10 days before the hearing so that the

22  inmate has time to prepare a defense (id. ¶ 41).  The inmate signs and dates the Hearing

23  Notice to acknowledge that he received it (id.).  The inmate chooses whether to appear at

24  the hearing or waive his right to appear and whether he will request witnesses; witnesses

25  are requested using the STG Witness Request/Response form (id.).  The inmate's choices

26  are denoted on the Hearing Notice by checking boxes or initialing next to each choice

27  (id.).  If the inmate requests witnesses, the Complex SSU Coordinator provides the inmate

28  the witness forms and, no later than five business days before the hearing, picks up the

completed forms from the inmate (id.).

If an inmate is validated, it means that the inmate is determined to be or to have been a member of an STG (id. ¶ 35).  Also, if an inmate's participation level meets the criteria of membership in an STG but the STG has not granted the inmate membership, the inmate can still be validated as a member (id.).  Validation is determined on a point system, with varying point values assigned to specific criteria of evidence (id. ¶¶ 36-37).  Validation requires a certain number of points in at least two of the criteria categories (id. ¶ 37).

Once an inmate has been validated as a STG member through the STG validation process, the inmate may appeal the validation decision, choose to renounce his STG membership through the debriefing process, or accept his validation and not renounce his STG membership (id. ¶ 45).  An inmate who refuses to renounce and debrief receives an annual review by Classification staff (id. ¶ 49).  The review consists of an inquiry as to (a) whether the inmate is still associated with an STG or (b) whether the inmate has disassociated himself from the STG, renounced his gang affiliation, and is sincerely willing and able to debrief (id.).  A validated inmate is considered an ongoing threat to prison security and, therefore, is segregated and assigned to be housed at the maximum-security Browning Unit until the inmate is released from prison, renounces his STG membership and satisfactorily debriefs, or successfully completes the ADC Step-Down Program (SDP) (id. ¶ 51).

Renunciation is when a validated STG member renounces his STG affiliation (id. ¶ 53).  This is followed by the debriefing process, in which an STG Unit staff member uses a STG Questionnaire to document the claim that an inmate is no longer a member of an STG (id. ¶ 54).  The objectives of the debriefing process are to (1) learn enough about the validated STG member and the STG to determine whether the inmate has withdrawn from the STG, (2) provide information regarding the STG's structure and activity that would adversely impact the STG and assist in management of the STG population, and (3) provide sufficient information to determine if the inmate requires protection from

other STG members or suspects (id. ¶ 55).  A validated STG member who renounces membership and satisfactorily debriefs is housed in Protective Segregation (PS) and is then reviewed for permanent PS status (id. ¶ 58).  A validated STG member can request to renounce and debrief at any time (id. ¶ 62).

As an alternative to the debriefing process, a validated STG member may be able to leave the Browning Unit through the SDP, which provides an inmate the opportunity to demonstrate that he is not involved in STG activity (id. ¶ 65).  To be eligible for the SDP, an inmate must have completed a continuous 24-month period where he did not participate in any documented gang activity, and he must make a written request to participate in the program (id. ¶¶ 68, 85).  There are different phases in the SDP that provide inmates progressively more freedom in small increments, and the program must be completed within 18 months of the date of entry into the program (id. ¶¶ 90, 92).

### b. Plaintiff's Validation

Plaintiff was served with the Hearing Notice on March 12, 2008 (id. ¶ 130).  This Notice informed Plaintiff that he was suspected of being an STG member of the Aryan Brotherhood, the basis for that suspicion and the charges against him, and that his Validation Hearing was scheduled for March 27, 2008, at 9:00 a.m. (id. ¶ 131).  On the Hearing Notice form, Plaintiff checked the boxes indicating that he would appear at the hearing and that he requested witnesses (id. ¶¶ 132-133).  Also on March 12, 2008, Plaintiff was given blank STG witness forms (id. ¶ 136).  Plaintiff's hearing was rescheduled for May 23, 2008 (id. ¶¶ 137-138; Doc. 59, Ex. D, Attach. 3).

Plaintiff submitted completed witness forms to Lieutenant Smith, who forwarded the forms to the witnesses (id. ¶¶ 139-40).  The witnesses returned the forms to Smith, and Smith placed them in the Validation Packet (id. ¶ 141).

The validation hearing was held on May 23, 2008, with Plaintiff in attendance (id. ¶ 142).  The STG Committee included Kimble, Bock, and Freeland (id. ¶ 143).  Plaintiff was able to review each piece of evidence used to support his validation and provide a response or explanation to the Committee (id. ¶¶ 145-147).  The Committee found

evidence to support 23 points in four categories, which was sufficient to validate Plaintiff as an STG member (id. ¶¶ 148-149).  Plaintiff received written results of the Validation Hearing at the hearing and he acknowledged receipt by signing his name (id. ¶ 150).

Plaintiff chose to appeal the validation decision (id. ¶¶ 152).  In his appeal, Plaintiff claimed that the "some evidence" standard was unconstitutional when the result of the hearing was indefinite detention; that there was no evidence that he had a history of violence or misconduct; that his due process rights were violated when the Committee relied on vague evidence; and that the Committee failed to support their decision with specific documentation or citation to evidence in the record (id. ¶ 152).  The STG Appeals Committee upheld the validation (id. ¶ 158).

To date, Plaintiff has not made a request to renounce or to debrief, nor has he made a request to participate in the Step-Down Program (id. ¶ 159).

**2.  Defendants' Legal Arguments**

In their motion, Defendants acknowledge that Plaintiff possessed a liberty interest in avoiding transfer to the Browning Unit and, therefore, was entitled to sufficient procedural and evidentiary standards (Doc. 58 at 11).[3]  They submit that due process requires notice but that it does not require detailed written notice (id. at 12).  According to Defendants, Plaintiff admitted that he received written notice of the hearing, and they state that this notice set out in great detail the evidence that would be used to validate him as an STG member (id. at 11-12).

In response to Plaintiff's claim that he was denied an adversarial hearing and the opportunity to present his views, Defendants submit that this type of situation does not require an adversarial hearing and Plaintiff was provided the opportunity to respond to and dispute each piece of evidence (id. at 12).  Defendants note that Plaintiff did, in fact, respond to the evidence used to validate him (id.).  Defendants also assert that Plaintiff listed questions to be asked of witnesses that he chose and those witnesses' responses

---

[3]Defendants refer to Plaintiff's transfer to "SMU II" (Special Management Unit II) (Doc. 58 at 11), which was the former name of the Browning Unit (Doc. 59 at 2 n. 2).

were supplied to the Validation Committee for consideration (id.).  Thus, Defendants contend that Plaintiff was given the opportunity to present witnesses, which exceeds the due process required at an administrative segregation hearing (id.).

Defendants next argue that because the validation hearing is an administrative process—not disciplinary—due process only requires a "some evidence" standard and, here, there was significantly more than "some evidence" to support the finding that Plaintiff is a STG member (id. at 12-13).  Defendants identify the specific evidence that the Validation Committee reviewed (id. at 13-14).  They also point out that other courts in this district have reviewed the same validation process and concluded that it comports with due process (id. at 15, citing Hampton v. Ryan, 2008 WL 2959604, at *1 (9th Cir. Aug. 4, 2008), and Baptisto v. Ryan, 2005 WL 2416356, at *5-6 (D. Ariz. Sept. 30, 2005)).

Similarly, Defendants contend that the annual review of Plaintiff's STG status satisfies due process (Doc. 58 at 15-16).  They state that Plaintiff is in the Browning Unit solely because of his validation as a STG member; thus, the only way to remove himself from the unit is to separate himself from the STG through debriefing or the SDP (id. at 15-16).  Defendants reiterate that Plaintiff can request to debrief or to enter the SDP at any time (id. at 16).  Defendants state that as long as Plaintiff is an STG member, he is a security risk (id.). Defendants maintain that annual reviews of Plaintiff's status are sufficient to determine whether Plaintiff remains a security risk (id.).  Defendants assert that it has already been ascertained that Plaintiff is an STG member and, since periodic reviews are not to re-argue that determination, officials need not consider additional evidence at the periodic review—they need only determine whether the basis for Plaintiff's placement still exists (id. at 17-18).  And Defendants argue that other courts have supported that annual reviews for inmates in supermax facilities are sufficient (id. at 18-19).

As to Plaintiff's claim that he would be labeled a snitch if he debriefed, Defendants contend that it is mere speculation, particularly given that Plaintiff has not

1   participated in the debriefing process (id. at 20-21).  Defendants further contend that the

2   SDP provides Plaintiff  a way out of the Browning Unit without the requirement that he

3   provide gang information to officials (id. at 21).  Defendants assert that they have

4   nonetheless taken affirmative steps to ensure the safety of debriefed inmates by placing

5   them in protective segregation (PS), which is the method used to protect inmates who are

6   threatened by other inmates (id.).  They argue that this is a reasonable response to any

7   possible risk associated with debriefing (id.).

8          For the above reasons, Defendants request summary judgment on Count I.

9                          **3.  Plaintiff's Factual Assertions**

10         In his Complaint, Plaintiff alleges that he was denied written notice of the charges

11  against him and was therefore unable to prepare his defense (Doc. 1 at 3(A) ¶¶ 8-9).  He

12  further alleges that although he completed witness forms, Smith and Celaya failed to

13  provide the witnesses' answers to Plaintiff, and he claims that he was not allowed to

14  present the witnesses' statements to the Validation Committee or call witnesses at the

15  hearing (id. at 3(B) ¶¶ 11-12, 14).  Plaintiff also asserts that he was not allowed to present

16  his views against validation (id. at 3(C) ¶ 15).  And he claims that the Committee did not

17  provide a written statement of the evidence relied upon and the reason for its decision (id.

18  at 3(B)-(C) ¶¶ 13, 15).

19         With respect to the annual reviews, Plaintiff avers that they are not meaningful

20  reviews and amount to nothing more than a "rubber stamp" of the initial validation (id. at

21  3(E)-(F) ¶¶ 19, 21).  Plaintiff asserts that the debriefing process subjects a prisoner to the

22  risk of being classified as a snitch, which puts his life in danger (id. at 3(E) ¶ 20).

23  Plaintiff also maintains that there is no other meaningful way to exit indefinite

24  confinement at the Browning Unit (id. at 3(F)-(G) ¶¶ 23, 26).

25         **C.   Analysis**

26                    **1.  Notice, Opportunity to Question Witnesses, Hearing**

27         Although Plaintiff claims that he did not receive proper notice prior to his

28  validation hearing, the record includes a copy of the Hearing Notice, which is signed and

                                          - 13 -

dated by Plaintiff as received on March 12, 2008 (Doc. 59, Ex. D, Attach. 2).  The Notice clearly states that Plaintiff is accused of being a member of an STG and identifies the specific evidence that supports that accusation (Id.).  The Notice describes nine incidents in which staff discovered evidence supporting the STG charge against Plaintiff; the descriptions include dates, names of other inmates involved, and the specific items of evidence—including address books, a membership list, poems, letters and correspondence (id.).

The Court finds that the record shows Plaintiff received the Hearing Notice and this Notice more than adequately set forth a "brief summary of the factual basis" for suspecting Plaintiff of STG membership.  In addition, the Notice provided sufficient information, including specific dates and named inmates who were connected to various incidents, for Plaintiff to prepare a rebuttal to the charges.  See Wilkinson, 545 U.S. at 226.

Defendants' evidence includes two completed witness forms that were included in the Validation Packet reviewed by the Validation Committee and a copy of the "result" form outlining the results of the hearing (Doc. 59, Ex. D, Smith Decl. ¶¶ 20-21, Attachs. 4-5).  The "results" form documents Plaintiff's response to each item of evidence (id.).  In failing to respond to Defendants' motion, Plaintiff does not demonstrate how—in light of this evidence—he was prevented from questioning witnesses or adequately responding to the specific charges against him.

The "results" form also explains the basis for the Committee's findings, and it specifies the evidence that the Committee relied upon (id.).  The face of the form reflects that Plaintiff received and signed it on May 23, 2008 (id.).

The Court notes that inmate gang validations are subject to the "some evidence" standard, which sets a low bar; a single piece of evidence may be sufficient to meet the "some evidence" requirement, if that evidence has "sufficient indicia of reliability." Bruce v. Ylst, 351 F.3d 1283, 1287-88 (9th Cir. 2003).  Courts are not required to "examine the entire record, independently assess witness credibility, or reweigh the

1    evidence; rather, 'the relevant question is whether there is any evidence in the record that
2    could support the conclusion.'"  Id. at 1287 (citing Superintendent, Mass. Corr. Inst. v.
3    Hill, 472 U.S. 445, 455-56 (1985)).  Here, the "results" form reflects that there was
4    sufficient evidence to support Plaintiff's validation.

5           On the record before the Court, the Hearing Notice, the procedures for questioning
6    witnesses, the validation hearing, and the evidentiary standard applied all met due process
7    requirements.

8                                 **2.  Annual Reviews**

9           According to Plaintiff, the annual review process constitutes a very limited review
10   and is little more than a cursory "rubber stamp" of the validation process (Doc. 1 at 3(E)
11   ¶ 19).  Defendants maintain that the annual reviews are sufficient for inmates housed in
12   supermax due to their STG status, as opposed to inmates housed in supermax for other
13   reasons, in which case more frequent reviews are required (Doc. 58 at 17-18).

14          To the extent Defendants argue that annual reviews alone are sufficient to satisfy
15   due process, their argument fails.  In Hernandez v. Schriro—a case involving an STG
16   inmate housed in the same facility as Plaintiff—the Ninth Circuit reversed the district
17   court's finding that annual reviews did not violate due process and specifically stated that
18   annual reviews alone are insufficient.  357 F. App'x 747, 749 (9th Cir. 2009) (citing
19   Toussaint v. McCarthy, 801 F.2d 1080, 1101 (9th Cir. 1986), abrogated in part on other
20   grounds by Sandin, 515 U.S. 472).

21          But Defendants' evidence reflects that in addition to annual reviews, Plaintiff can
22   renounce and debrief at any time (Doc. 59, Ex. B, Dunn Decl. ¶ 66).  On remand in
23   Hernandez, this Court found that annual reviews, combined with the option to debrief at
24   any time, satisfied due process.  2011 WL 2910710, at *8 (D. Ariz. July 20, 2011).  The
25   Court observed that no prior case had held that debriefing as the sole method of leaving
26   administrative segregation violates due process.  Id., at *9 (citations omitted).  And the
27   plaintiff in Hernandez, just like Plaintiff in this case, had not requested to debrief (Doc.
28   59, Ex. D, Smith Decl. ¶ 39).  See Hernandez, 2011 WL 2910710, at *9.  Consequently,

1   there was no evidence of a risk of erroneous result in his annual review process.  See id.;

2   Matthews, 424 U.S. at 335.

3          The Hernandez Court balanced the three Matthews factors and determined that the

4   plaintiff could not show that the process afforded him, i.e., the annual reviews with

5   debriefing available, was inadequate.  2011 WL 2910710, at *8-9.  "Because debriefing is

6   available at any time, the periodic review of [the plaintiff's] status satisfies the Matthews

7   test . . . ."  Id., at *9.  Plaintiff presents nothing that causes this Court to find differently in

8   the instant action.

9                                **3. Debriefing**

10         Plaintiff contends that debriefing creates a serious risk to an inmate's safety

11  because he is then identified as a snitch (Doc. 1 at 3(E) ¶ 20).  The Eighth Amendment

12  requires prison officials to protect prisoners from violence at the hands of other prisoners.

13  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  To establish an Eighth Amendment

14  violation, a prisoner must first satisfy an objective requirement—he must show that he

15  has been transferred into "conditions posing a substantial risk of serious harm."  Id. at

16  834.  Then, he must satisfy a subjective requirement—he must show that the defendant

17  was aware of the risk and disregarded it.  Id. at 834, 837.  Courts have recognized that

18  being labeled a snitch can place an inmate at a risk of harm.  See Valandingham v.

19  Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989); see also Wilkinson, 545 U.S. at 227

20  ("[t]estifying against, or otherwise informing on, gang activities can invite one's own

21  death sentence").  But it is unclear whether this same risk is present when an inmate is

22  placed in PS as opposed to the general population.  See Hernandez, 2011 WL 2910710, at

23  *5 (distinguishing the risk of harm faced by inmates who are labeled as snitches and

24  placed in general population with debriefed inmates who are labeled as snitches and

25  placed in PS).

26         Regardless, even assuming that the objective prong of the deliberate indifference

27  analysis is met when an inmate debriefs and is identified as a snitch, see Farmer, 511 U.S.

28  at 833, Plaintiff has not satisfied the subjective prong.  Defendants' undisputed evidence

1   shows that they did not disregard this risk to inmates' safety.  The evidence shows that a

2   debriefed STG member is not housed with other inmates but is placed in PS (Doc. 59, Ex.

3   B, Dunn Decl. ¶ 62).  In failing to respond to Defendants' evidence, Plaintiff presents

4   nothing to suggest that PS placement does not provide reasonable safety to debriefed

5   inmates following their transfer out of the Browning Unit.  See Farmer, 511 U.S. at 844

6   (finding that a prison official who responds reasonably to a risk is not liable—even if the

7   harm ultimately is not averted).  Further, because the record shows that Plaintiff has not

8   debriefed, he cannot show that he has faced or will face a substantial risk of serious harm

9   in PS.  See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987) (the "mere threat" of future

10  bodily harm to a prisoner may not provide a basis for a cognizable Eighth Amendment

11  claim).  In short, Plaintiff cannot demonstrate that debriefing is not an adequate

12  alternative to annual reviews.

13          In light of the above, Defendants are entitled to summary judgment on Plaintiff's

14  due process claim in Count I.

15  **V.      Count II-Conditions of Confinement**

16          Plaintiff alleges that the following conditions of his confinement violate the Eighth

17  Amendment: (1) isolation; (2) cell illumination; (3) limited recreation; (4) denial of

18  adequate food; (5) restricted privileges; and (7) hygiene/sanitation (Doc. 1 at 3(C)-(D)

19  16).

20          **A.      Legal Standard**

21          "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

22  punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319

23  (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that are totally

24  without penological justification."  Rhodes v. Chapman, 452 U.S. 337, 346 (1981)

25  (citation omitted).  To demonstrate that a prison official has deprived an inmate of

26  humane conditions in violation of the Eighth Amendment, two requirements must be

27  met—one objective and one subjective.  Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th

28  Cir. 2000).  First, "the prison official's acts or omissions must deprive an inmate of the

1   minimal civilized measure of life's necessities." Id. (internal citation omitted).  The

2   subjective prong requires the inmate to demonstrate that the deprivation was a product of

3   "deliberate indifference" by prison officials.  Wilson v. Seiter, 501 U.S. 294, 303 (1991).

4   As mentioned above with regard to prison officials' obligation under the Eighth

5   Amendment to protect prisoners from other prisoners, deliberate indifference occurs only

6   if a prison official "knows of and disregards an excessive risk to inmate health or safety;

7   the official must both be aware of facts from which the inference could be drawn that a

8   substantial risk of serious harm exits, and he must also draw the inference." Farmer, 511

9   U.S. at 837.

10          **B.**    **Isolation**

11        The Ninth Circuit has found that "administrative segregation, even in a single cell

12   for twenty-three hours a day, is within the terms of confinement ordinarily contemplated

13   by a sentence." Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing

14   Toussaint, 801 F.2d at 1091-92).  Even so, the Ninth Circuit has also recognized that the

15   harsh conditions such as those in the Browning Unit can cause psychological harm.  See

16   Miller v. Stewart, 231 F.3d 1248, 1252 (9th Cir. 2000) (in a death row case, experts stated

17   that conditions present in [supermax placement] can cause psychological decompensation

18   to the point of incompetency).  Other courts, however, have found that standing alone, the

19   isolation inherent in segregation does not violate the Eighth Amendment.  In re Long

20   Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472

21   (4th Cir. 1999) ("the isolation inherent in administrative segregation or maximum custody

22   is not itself constitutionally objectionable"); Jackson v. Meachum, 699 F.2d 578, 581-83

23   (1st Cir. 1983) (no Eighth Amendment violation by confining inmate in indefinite

24   segregation that was otherwise satisfactory except for virtually no communication or

25   association with other inmates, even when conditions caused depression).

26        While it is clear that something more than isolation is required to violate the

27   Eighth Amendment, it is not exactly clear what the standard is.  But the Court need not

28   reach that question because the evidence does not show that Plaintiff is incarcerated in

1    complete isolation.

2            Plaintiff alleges that the only socialization available is brief telephone calls with

3    family and friends and limited visitation through protective glass (Doc. 1 at 3(C)

4    ¶ 16(A)).

5            In contrast, Defendants' evidence shows that some maximum-custody inmates can

6    communicate with other inmates in their cell group, though not face-to-face (Doc. 59,

7    DSOF ¶ 112).  And, as Plaintiff acknowledges, there is visitation at the Browning Unit.

8    Inmates are permitted a weekly two-hour block of non-contact visitation with up to four

9    visitors at a time (id. ¶ 113).  STG-validated inmates are allowed one 15-minute telephone

10   call per week (id. ¶ 114).  See Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996)

11   (prisoner telephone access is subject to reasonable security limitations) (citation omitted).

12   In addition, inmates housed at the Browning Unit may possess soft cover books and

13   cassette players and head phones (DSOF ¶ 115).

14           The undisputed evidence shows that Plaintiff has opportunities for limited social

15   contact and, therefore, is not isolated to a degree that would violate the Eighth

16   Amendment.  Moreover, as discussed above, at any time Plaintiff may initiate the

17   debriefing process, which may allow him to transfer out of the Browning Unit and its

18   limits on social contact.  Defendants will be granted summary judgment on the isolation

19   claim.

20           **C.      Cell Illumination**

21           The Eighth Amendment requires that inmates be given appropriate lighting.

22   Keenan, 83 F.3d at 1090.  Constant illumination of a prison cell, standing alone, has been

23   upheld as constitutional under certain circumstances.  See, e.g., Warren v. Kolender, 2009

24   WL 196114, at *15 (S.D. Cal., Jan. 22, 2009).  But 24-hour lighting with excessively

25   bright bulbs has been held to violate the Eighth Amendment.  See Keenan, 83 F.3d at

26   1090–91.  Thus, the inquiry into whether constant security lighting in prison cells violates

27   the Eighth Amendment is necessarily fact-specific and often depends upon the brightness

28   of the light at issue.  For example, 24-hour lighting with single 9-watt or 13-watt bulbs

has been found not to be objectively unconstitutional.  Vasquez v. Frank, 290 F. App'x 927, 929 (7th Cir. Aug.15, 2008) (24-hour lighting with one 9-watt fluorescent bulb not an "extreme deprivation"); McBride v. Frank, 2009 WL 2591618, at *5 (E.D. Wis. Aug.21, 2009) (24-hour lighting with a 9-watt fluorescent bulb not unconstitutional); Wills v. Terhune, 404 F. Supp. 2d 1226, 1230-31 (E.D. Cal. 2005) (24-hour illumination by 13-watt bulb not objectively unconstitutional); compare with Keenan, 83 F.3d at 1090-91 (24-hour lighting from "large fluorescent lights" unconstitutional where prisoner could not tell if it was night or day).

Plaintiff alleges that the lights cannot be turned off day or night (Doc. 1 at 3(C) ¶ 16(B)).  He claims that the 24-hour lighting serves no legitimate purpose other than to torment prisoners (id.).

Defendants explain that each cell in the Browning Unit contains four light bulbs: one 40-watt fluorescent lamp "up light"; two 40-watt fluorescent lamps "down light"; and one 7-watt fluorescent night light (Doc. 59, DSOF ¶ 105).  During the day, all four bulbs remain on and, at night, only the 7-watt night light remains on (id.).  Defendants submit that the 7-watt security light enables staff to conduct health and welfare/security checks during the night and ensures the safety of the officers (id. ¶ 106).

In light of Plaintiff's failure to respond to Defendants' evidence that there is a single dimmed light at night and that this light is for security purposes, the Court finds the Defendants are entitled to summary judgment on this claim.

### D.   Recreation

Exercise is a basic human necessity protected by the Eighth Amendment; thus, the deprivation of outdoor exercise for inmates who are under long-term segregation violates the Constitution.  Keenan, 83 F.3d at 1089.  But restricting an prisoner's exercise privileges may be reasonable if the prisoner represents a serious security risk.  LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993).  Five hours of exercise per week has been found to be constitutionally sufficient.  See Baptisto v. Ryan, 2006 WL 798879, at *33 (D. Ariz. March 28, 2006) (collecting decisions of the Fourth, Fifth, Seventh, Eighth,

1  Ninth, and Tenth Circuits).

2      Plaintiff asserts that STG inmates are never allowed outside and the "recreation

3  area" is simply a 10x20 walled, concrete box with 20-foot high walls and a steel grated,

4  mesh top (Doc. 1 at 3(C) ¶ 16(C)).  He alleges that, except for one racquetball, no

5  exercise equipment is provided and his only contact with the sun is an occasional glimpse

6  through a skylight (id.).

7      Defendants proffer evidence that inmates housed in the Browning Unit receive six

8  hours of out-of-cell recreation per week and the six hours are on three different days and

9  two hours in duration (Doc. 59, DSOF ¶ 118).  The recreation area has a cement floor and

10  walls and a steel mesh top that allows fresh air and sunlight into the area (id. ¶ 119).

11  During recreation sessions, inmates may use a racquetball/handball, a hackie sack, a

12  kickball and/or a walkman (id.).

13      In failing to respond, Plaintiff does not dispute that he receives six hours of

14  exercise per week, which is more than required.  Further, the evidence shows that he gets

15  natural light and fresh air.  On this record, Defendants are entitled to summary judgment

16  on Plaintiff's exercise claim.

17      **E.      Food**

18      "The Eighth Amendment requires only that prisoners receive food that is adequate

19  to maintain health; it need not be tasty or aesthetically pleasing." LeMaire, 12 F.3d at

20  1456. "The fact that the food occasionally contains foreign objects or sometimes is served

21  cold, while unpleasant, does not amount to a constitutional deprivation." Id. (internal

22  citations omitted).  But if an inmate is served meals with insufficient calories for long

23  periods of time, he may be able to demonstrate a violation of his right against cruel and

24  unusual punishment. Id.

25      Plaintiff alleges that he is provided just one hot meal a day along with a cold sack-

26  lunch meal that serves as a combined breakfast and lunch (Doc. 1 at 3(D) ¶ 16(D)).  He

27  states that this low-calorie diet is used as punishment against STG prisoners (id.).

28      Defendants confirm that inmates at the Browning Unit received a reduced-calorie

diet due to their sedentary lifestyle (Doc. 59, DSOF ¶ 121).  According to Carlos Reyna, an ADC Lieutenant and the SSU Coordinator, a nutritionist designed the diet to ensure that these low-level activity inmates receive proper calories and nutrition (id., Ex. C, Reyna Decl. ¶ 27).  Reyna further explains that since 2010, STG-validated inmates receive three-meals-per-day during the week and two-meals-per day on the weekends, with one hot meal each day (id. ¶ 30).

Plaintiff presents no specific facts or evidence to dispute Defendants' evidence that the calories provided to him are determined by a nutritionist to meet his health needs, nor does he present any evidence that he has been injured or is underweight as a result of the diet he receives.  Accordingly, summary judgment is appropriate on Plaintiff's diet claim.

### F.    Privileges

Plaintiff alleges that STG prisoners are denied participation in sentence-reducing rehabilitation programs, vocational programs, and other classes and activities (Doc. 1 at 3(D) ¶ 16(E)).  These allegations fail to implicate the Eighth Amendment.  There is no constitutional right to rehabilitation, and the lack of educational or vocational programs does not rise to a constitutional violation.  Hoptowit v. Ray, 682 F.2d 1237, 1254-55 (9th Cir. 1982), abrogated in part on other grounds by Sandin, 515 U.S. 472.  Even so, Plaintiff does not dispute that he is allowed to have limited drawing materials and he may be eligible to participate in limited in-cell education programs (DSOF ¶¶ 117, 126).

### G.    Hygiene

A complete denial of personal hygiene items violates the Eighth Amendment.  See Keenan, 83 F.3d at 1089-91.  And subjecting an inmate to lack of sanitation that is severe or prolonged can rise also to a constitutional deprivation.  Anderson, 45 F.3d at 1314; see Hutto v. Finney, 437 U.S. 678, 686-87 (1978).  Therefore, prison officials must provide inmates with adequate sanitation.  See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  If a prison official's refusal to provide adequate cleaning supplies prohibits inmates from maintaining minimally sanitary cells and thereby threatens their health, it amounts to a constitutional violation.  See Hoptowit v. Spellman, 753 F.2d 779, 784 (9th

Cir. 1985).

Plaintiff states that he receives just three eight minute showers a week and he is denied access to mops, brooms, and cleaning supplies (Doc. 1 at 3(D) ¶ 16(F)-(G)).

Defendants submit that STG prisoners are issued cleaning supplies twice a week, including a scrub brush, a sponge, and a spray bottle (Doc. 59, DSOF ¶ 102). The prison staff is responsible for cleaning the pod common areas (id. ¶ 103). Defendants also present evidence that STG prisoners may purchase hygiene items from the commissary (id. ¶ 116).

Plaintiff's concession that he is allowed three showers a week along with evidence that he may purchase hygiene items shows that he is not denied the right to personal hygiene. Plaintiff does not dispute that he is provided with some cleaning supplies, and he does not allege that he is completely unable to maintain sanitation in his cell. Defendants will therefore be granted summary judgment on this claim.

Because summary judgment will be granted on the due process claim (Count I) and the above conditions-of-confinement claims (Count II), the Court need not address Defendants' argument for qualified immunity (see Doc. 58 at 25-28).

**IT IS ORDERED:**

(1) The reference to the Magistrate is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 58).

(2) Defendants' Motion for Summary Judgment (Doc. 58) is **granted**.

(3) The Clerk of Court must enter judgment accordingly and terminate the action.

DATED this 8th day of February, 2012.

Stephen M. McNamee
United States District Judge